IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ASTRA SPACE, INC. f/k/a HOLICITY INC. SECURITIES LITIGATION | Case No. 22-cv-08875-CRB <br><br> **ORDER GRANTING MOTION TO DISMISS** |

In 2021, SPACs took off.

SPACs, or Special Purpose Acquisition Companies, are a type of "blank-check" corporations with the intention of raising funds through an IPO to acquire or merge with a private company. SPACs provide an alternative way for private companies to go public and bypass the traditional IPO process. After the merger, the target company replaces the SPAC and becomes a publicly-traded company. SPACs allow for a faster timeline to market and lower regulatory requirements.

One of the many companies that went public through a SPAC in 2021 was Astra Space, which merged with Holicity. Astra is a satellite launch services company. In SEC filings and public interviews, Astra and its CEO stated that their goal is to launch 300 rockets in 2025 and to build a rocket that could carry a cargo weighing up to 500kg by 2023.

In this case, the Plaintiffs have filed suit under the Securities Exchange Act of 1934, alleging that Astra's stated goals were false or misleading. They claim that statements about Astra's target to launch 300 rockets in 2025 were misleading because it would be

impossible for Astra to have, in 2025, a total addressable market large enough to meet that goal. The Plaintiffs also allege that statements about Astra's goal to build a rocket with a 500kg payload capacity were misleading because the Defendants did not disclose that Astra was licensing its rocket engine IP from a competitor, and that Astra could not use the licensed IP to build a larger rocket.

Astra has moved to dismiss for failure to state a claim.

## I.     BACKGROUND

### A.     Astra Space, Inc.

Founded in 2016 by Chris Kemp who serves as its CEO, Astra is a space launch service provider that aims to provide small satellite ("smallsat") manufacturers and operators with inexpensive, frequent, and precise deployment of small satellites to orbits. Compl. ¶¶ 2, 15 (dkt. 48). Smallsat manufacturers develop satellites that enable a wide range of applications, such as Earth observation and communications. Id. ¶ 43.

Astra prides itself for having successfully launched a commercial satellite faster than any other company in history. See MTD at 1 (dkt. 64). Space launch services involve delivering satellites and other equipment into orbit. To achieve a successful launch, a rocket must not only make it to space but also carry a payload to its destination and deploy a satellite into orbit. Compl. ¶ 41. A payload refers to the cargo or satellite that a rocket is designed to carry into space. Id. ¶ 3 n.1.

Astra has incurred significant losses and earned no revenue. Id. ¶ 40. The rocket launch industry is highly competitive and includes approximately one-hundred small launch providers directly competing with Astra. Id. ¶ 41. There also are larger and more well-known launch companies, like Elon Musk's SpaceX and Jeff Bezos' Blue Origin. Id. ¶ 41.

Astra plans to earn revenue by eventually contracting with smallsat manufacturers to launch their satellites to low Earth orbits ("LEO"). Id. ¶ 42. LEO is an orbit around the Earth with an altitude that lies towards the lower end of the range of possible orbits. Id. Most satellites are now in LEO, as is the International Space Station. Id. Astra also plans

1  to earn revenue by offering in-space services, including operating orbital transfer vehicles.
2  Id. ¶ 2. This would take satellites that did not reach their precise targets the rest of the way
3  to their desired orbits. Id. Astra hopes to make itself a compelling option for LEO
4  constellation deployment and satellite replenishment. See id. ¶¶ 68, 91.

5      Astra has not reliably launched its rockets. Out of ten launch attempts between July
6  2018 and June 2022, only two successfully achieved orbit. Id. ¶ 45.

### B. Merger with Holicity

8      On February 2, 2021, Holicity, a SPAC, announced it had entered into a merger
9  agreement with Astra Space. Compl. ¶¶ 38, 70. On June 8, 2021, Holicity's shareholders
10 were sent a proxy statement, and on June 30, 2021, the shareholders voted overwhelmingly
11 to approve the merger. Id. ¶¶ 38, 63. Holicity then took on the Astra name.

12     From February 2, 2021 through December 29, 2021, see id. ¶ 1, Astra publicly
13 stated, in interviews with its CEO and in SEC filings, that its long-term goal was to
14 achieve a near-daily cadence of 300 launches by 2025. See id. ¶¶ 3, 55, 57. In its proxy
15 statement, Astra stated: "We aim to achieve a monthly launch cadence by the end of 2021
16 and approach a daily launch cadence by the end of 2025[,]" and "[w]e are on track to begin
17 commercial launch operations in 2021, with a goal of reaching a once-daily launch
18 cadence by the end of 2025." Id. ¶ 64.

19     Astra also made statements in various quarterly SEC filings about its goal of
20 increasing its payload capacity rocket from 300kg to 500kg by late 2023: "As part of our
21 strategy, we plan to increase the maximum payload capability of our rockets from
22 approximately 50 kg for our first commercial flight to up to 500 kg for a mid-inclination
23 500 km orbit, which we believe will make Astra a compelling option for low Earth orbit
24 constellation deployment and replenishment." See id. ¶¶ 91 (Q2-2021, Form 10-Q);
25 103 (Q3-2021, Form 10-Q). On November 11, 2021, Astra issued a press release attached
26 to a SEC Form 8-K, which stated that "Astra continues to move forward on its goal of
27 daily launches." Id. ¶ 98.

28     To meet its goal of increasing its payload capacity to 500kg by late 2023, in early

1  2021, Astra licensed the intellectual property for the Reaver engine from its competitor,
2  Firefly ("Firefly Agreement").  See id. ¶¶ 47, 52.  The Firefly Agreement purportedly
3  limited Astra to two engines per rocket, enough to achieve a 500kg payload but not exceed
4  it.  See id. ¶¶ 47–48, 52.  Astra did not publicly disclose the Firefly Agreement.  Id. ¶ 100.
5  Kemp "declined to comment" on the Firefly Agreement in press reports and did not
6  confirm the existence of the agreement.  Id. ¶¶ 49–50, 100.
7  Astra' SEC filings were accompanied by risk factor disclosures about its ability to
8  achieve the target cadence, viz.:

- "Our ability to achieve a more frequent than monthly launch capability by 2025 will depend on our ability to add new launch sites . . . . We have in the past and may in the future experience delays in our efforts to secure additional launch sites around the globe.  Challenges as a result of regulatory processes or in our ability to secure the necessary permissions to establish these launch sites could delay our ability to achieve our target cadence and could adversely affect our business."

- "Our ability to achieve this increased launch cadence within the timeframe in which we hope to do so will depend on our ability to secure the necessary regulatory licenses from the FAA, the FCC and other regulatory authorities.  To our knowledge, the applicable regulatory authorities to date have not granted such licenses to a company endeavoring to launch rockets with such frequency, and as a result our business is dependent upon a regulatory framework that is untested and unprecedented."

- "Further, launch operations within restricted airspace requires advance scheduling and coordination with government agencies and range owners and other users, and any high priority national defense assets will have priority in the use of these resources, which may impact our cadence of our launch operations."

- "If we commercialize outside the United States, we will be exposed to a variety of risks associated with international operations that could materially and adversely affect our business . . . . (including) the need for U.S. government approval to operate our space systems outside the United States."

- "If our operations continue to grow as planned, of which there can be no assurance, we will need to expand our sales and marketing, research and development, customer and commercial strategy, products and services, supply, and manufacturing and distribution functions.  We will also need to continue to leverage our manufacturing and operational systems and processes, and there is no guarantee

- that we will be able to scale the business and the manufacture of spacecraft as currently planned or within the planned timeframe."

- "Our continued growth could increase the strain on our resources, and we could experience operating difficulties, including . . . finding manufacturing capacity to produce our launch vehicles, rockets, spacecraft, space products and related equipment, and delays in production and launches."

- "The market for commercial launch services for small LEO satellites is still emerging, multiple mergers and acquisitions are shifting the market, and the market may not achieve the growth potential we expect."

Id. ¶¶ 56, 89.

### C.     The Kerrisdale Report

On December 29, 2021, market researcher and short-seller Kerrisdale released an online report, titled "Astra Space, Inc. (ASTR): Headed for Dis-Astra." Id. ¶ 105; id., Ex. 1 (dkt. 48-1). Kerrisdale has short positions in shares of Astra. Id., Ex. 1 at 2.

The Kerrisdale Report criticized "Astra's forecast calls for 300 launches per year by 2025 . . . [as an] exceptionally aspirational goal (which we view as pure fantasy). …" Id. ¶ 106. The report said that "not one expert whom we interviewed, nor any independent market study we reviewed, offered any reason to think that, industry-wide, sufficient market demand will exist for Astra to sustain approximately daily launches by 2035, let alone 2025." Id. The report continued: "Astra's financial forecasts rely on launching an astounding 165 rockets by 2024 and 300 rockets by 2025. To put these figures in context, 300 launches is 10x the total number of US commercial launches in 2022. 300 is nearly triple the total number of launches conducted globally in 2020." Id. Kerrisdale chastised Astra for "tout[ing] big picture themes like "$1 trillion+ Total Space Economy in 2040" (from Morgan Stanley)" and for "[not] specifying Astra's niche role in this economy and the true addressability for a rocket with only a 500kg payload capability (eventually)." Id.

Kerrisdale crunched its own numbers to show how Astra's total addressable market—i.e., the maximum potential market size—cannot support 300 launches a year by 2025. Kerrisdale explained: "We begin with [Northern Sky Research's] estimate of the total number of non-GEO satellites to be launched in 2025 (2,255). We then apply two

5

simple filters: 1) we exclude 90% or 851 of NSR's North American communications satellites forecast to account for Starlink (SpaceX launched 850 Starlink satellites in 2020), 2) we deduct 90% of satellites from Asia and 20% from Europe based on the contribution to these regions from Chinese and Russian satellites." Id.  Based on Kerrisdale's calculations, there remains "less than 600 satellites [as] the entire non-captive TAM for launch[,] [which] is easily supported by less than 100 total launches." Id. ¶ 107.

Kerrisdale also "explained that Astra's total addressable market is further impacted by many new entrants to the small launch industry, rideshare services, reusable launchers—all offering affordable alternatives to Astra's rocket." See id. ¶ 109.  The report noted that "Astra's rocket is undersized and cannot compete with the 1,000kg + payload capacities of its competitors and their ability to reuse their rockets, an ability Astra does not have because it uses cheap off the shelf components." Id. ¶ 110.

In addition, Kerrisdale criticized Astra's IP agreement to purchase the rights to manufacture and use two Reaver engines on its rocket from a competitor, Firefly. Id. ¶ 111.  The news of the Firefly IP agreement was first reported in The Verge on September 21, 2021. Id. ¶ 49.  According to Kerrisdale and based on The Verge article, the Firefly IP agreement "allegedly includes a clause that only allows Astra to use two Reaver engines per rocket – enough to hit Astra's goal of 500kg to 500km [mid-inclination orbit]." Id. Kerrisdale concluded that the Firefly IP agreement puts Astra in a competitive disadvantage because Firefly "is developing a 630kg–1,000kg rocket, and therefore the agreement caps Astra's use of the IP just below Firefly's capability and the emerging sweet spot for smaller launchers." Id.

After Kerrisdale published its report, on December 29, 2021, Astra's shares fell 14-percent, to a close at $6.61 per share. Id. ¶ 112.

**D.     The Complaint**

Lead Plaintiffs Marcos Luis Molins Garcia and Qingping Deng began purchasing Holicity stock on July 9, 2021 and August 9, 2021, respectively.  Dkt. 19-3 & 21-4.  They seek to represent shareholders who purchased stock during the class period from February

6

1    2, 2021 through December 29, 2021.  Compl. ¶ 1.  Relying primarily on the Kerrisdale
2    Report, the Plaintiffs have filed a lawsuit against Astra, its officers, and members of its
3    board of directors for violations of Sections 10(b), 14(a) and 20(a) of the Securities
4    Exchange Act.  The Plaintiffs' Complaint is premised on two theories.
5          First, the Plaintiffs allege that Astra's repeatedly stated goal of having 300 rocket
6    launches in 2025 was false or misleading because the total addressable market would not
7    be large enough to meet that goal once accounting for (1) satellite networks with a
8    committed launch provider, (2) satellites from China and Russia, which are subject to
9    regulatory constraints, and (3) satellites that "Astra could not lift given its limited payload
10   capacity of only 500kg."  See id. ¶¶ 57–58; see also id. ¶¶ 70–81, 84–90, 93–95, 98–99.
11         And second, the Plaintiffs allege that for Defendants' statements about Astra's
12   500kg target capacity, there should have been a corresponding disclosure that (1) Astra
13   was licensing the IP for its rocket engines from Firefly, and (2) the Firefly Agreement
14   limited Astra to two engines per rocket, which supposedly would prevent Astra from
15   exceeding its stated 500kg payload goal.  See id. ¶¶ 82–83, 91–92, 96–97, 100–04.
16         The Defendants have filed a motion to dismiss for failure to state a claim.

## II.   LEGAL STANDARD

18         To survive a motion to dismiss, a complaint must contain sufficient factual matter to
19   state a claim that is facially plausible.  Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S.
20   662, 678 (2009).  A claim is facially plausible when "the plaintiff pleads factual content
21   that allows the court to draw the reasonable inference that the defendant is liable for the
22   misconduct alleged."  Ashcroft, 556 U.S. at 678.  The court "must take all of the factual
23   allegations in the complaint as true," but it is "not bound to accept as true a legal
24   conclusion couched as a factual allegation."  Id.  The plausibility standard does not impose
25   a "probability requirement, but it asks for more than a sheer possibility that a defendant
26   acted unlawfully."  Id.
27         A complaint alleging fraud must also "state with particularity the circumstances
28   constituting fraud."  Fed. R. Civ. P. 9(b); Kearns v. Ford Motor Co., 567 F.3d 1120, 1125

7

1  (9th Cir. 2009). Rule 9(b) requires a plaintiff to set forth the "who, what, when, where,
2  and how" of the alleged fraud. Vess v. Ciba Geigy Corp. USA, 317 F.3d 1097, 1106 (9th
3  Cir. 2003). The purpose of Rule 9(b)'s heightened pleading requirement is to provide
4  notice to defendants of the specific fraudulent conduct against which they must defend.
5  Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001); Semegen v. Weidner, 780
6  F.2d 727, 732 (9th Cir. 1985) (the complaint "must be specific enough to give defendants
7  notice of the particular misconduct which is alleged to constitute fraud").

**III.  DISCUSSION**

Section 10(b) of the Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). One such rule promulgated under the Exchange Act is SEC Rule 10b–5, which provides: "It shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(c). Section 20(a) of the Exchange Act makes certain "controlling" individuals also liable for violations of section 10(b) and its underlying regulations.

Five elements are required to prove a primary violation of Rule 10b–5. A plaintiff must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 989–90 (9th Cir. 2009).

To state a claim under Section 14(a), the Plaintiffs must adequately allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."

8

1  Mendoza v. HF Foods Grp. Inc., 2021 WL 3772850, at *11 (C.D. Cal. Aug. 25, 2021)

2  (quoting N.Y.C. Emps.' Ret. Sys. v. Jobs, 593 F.3d 1018, 1022 (9th Cir. 2010)).

3        The Private Securities Litigation Reform Act of 1995 carves out a safe harbor from

4  liability for statements that are identified as "forward-looking" and are "accompanied by

5  meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). The "safe-harbor"

6  provisions of the PSLRA protect two kinds of statements: (1) forward-looking statements

7  accompanied by "meaningful cautionary language," and (2) forward-looking statements

8  which are made without actual knowledge of their falsity. 15 U.S.C. § 78u–5(c)(1)(A),

9  (B); see also In re Cutera Sec. Litig., 610 F.3d 1103, 1111–12 (9th Cir. 2010). "[I]f a

10 forward-looking statement is identified as such and accompanied by meaningful cautionary

11 statements, then the state of mind of the individual making the statement is irrelevant, and

12 the statement is not actionable regardless of the plaintiff's showing of scienter." Cutera,

13 610 F.3d at 1112.

14       Astra argues, among other things, that the Plaintiffs' primary liability claims should

15 be dismissed because the challenged statements are protected by the "safe harbor"

16 provisions of the PSLRA, and the Plaintiffs failed to adequately plead that Defendants had

17 actual knowledge that the statements when made were false.[1]

18       **A.**     **The Challenged Statements Were Forward-Looking.**

19       It is well-established that under the PSLRA, forward-looking statements include

20 "statement[s] of the plans and objectives of management for future operations, including

21 plans or objectives relating to the products or services of the issuer," as well as

22 "statement[s] of the assumptions underlying or relating to" such plans or objectives.

23 15 U.S.C. § 78u-5(i)(1). A forward-looking statement is defined as "any statement

24 regarding (1) financial projections, (2) plans and objectives of management for future

25 operations, (3) future economic performance, or (4) the assumptions 'underlying or related

---

[1] The Court takes judicial notice of the SEC filings that are attached as exhibits. In re Aqua Metals, Inc. Sec. Litig., 2019 WL 3817849, at *5 (N.D. Cal. Aug. 14, 2019); see Astra's RJN (dkt. 65 & 67). The other exhibits (e.g., The Verge article and Northern Sky Research report) are not material for the Court to resolve the motion to dismiss.

1   to' any of these issues." No. 84 Employer–Teamster Joint Council Pension Trust Fund v.
2   Am. W. Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u5 (i)).
3   And when a statement includes both forward-looking and non-forward-looking statements,
4   the challenged statements still fall within the safe harbor as forward-looking if, when
5   "examined as a whole, the challenged statements relate[ ] to future expectations and
6   performance." Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051,
7   1059 (9th Cir. 2014) (citing Cutera, 610 F.3d at 1111).
8       Here, the challenged statements concern Astra's future launch cadence goals in
9   2025 and the company's plan to increase its rocket payload capacity by late 2023. The
10  Plaintiffs appear to concede that the challenged statements about the total addressable
11  market are forward-looking. See Opp. at 11. The Plaintiffs, however, argue that
12  statements about Astra's rocket capacity are not forward-looking because the 2021 Firefly
13  Agreement placed immediate limitations to Astra. Opp. at 7.
14      The Plaintiffs' argument misses the point, however. Astra's statements were about
15  its goal of increasing its payload capacity from 300kg to 500kg by late 2023. When these
16  statements were made in 2021, they concerned a future target. That Astra allegedly was
17  restricted to building and using only two Firefly engines, which supposedly capped Astra's
18  capacity to 500kg, does not remove the forward-looking nature of Astra's statements.
19  When "examined as a whole, the challenged statements relate[ ] to future expectations and
20  performance"—that is, rocket capacity goals for 2023. See Intuitive Surgical, 759 F.3d at
21  1059. And the truth or falsity of the challenged statements "cannot be discerned until
22  some point in time after the statement[s] [were] made." See In re Copper Mountain Sec.
23  Litig., 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004). Courts regularly find that projections
24  for future performance are protected under the safe harbor. E.g., Wochos v. Tesla, Inc.,
25  985 F.3d 1180, 1192 (9th Cir. 2021) ("goal to produce 5,000 vehicles per week is
26  unquestionably a 'forward-looking statement'"); In re Fusion-io, Inc. Sec. Litig., 2015 WL
27  661869, at *3, 13 (N.D. Cal. Feb. 12, 2015) (statements about company's "position to
28  capture market share" were forward-looking) (Koh, J.); Police & Fire Ret. Sys. of Detroit

10

1    v. Axogen, Inc., 2020 WL 13547449, at *7–8 (M.D. Fla. Apr. 21, 2020) (estimate of
2    company's total addressable market is forward-looking because it is "inherently a future-
3    oriented abstraction of where and to whom goods might be sold").
4        Accordingly, the Court holds that the challenged statements are forward-looking
5    under the PSLRA.

### B.     The Risk Factors Provided Meaningful Cautionary Language.

7        Because the challenged statements fall "solidly within the category of forward-
8    looking statements," they are protected by the safe harbor if they were either (1)
9    "accompanied by cautionary language" or (2) "made without actual knowledge" of falsity.
10   Cutera, 610 F.3d at 1112–13.
11       Cautionary language renders forward-looking statements inactionable when the
12   warning is meaningful—that is, when it discloses risks and thus affects the reasonableness
13   of reliance on the misstatements. Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416
14   F.3d 940, 947 (9th Cir. 2005).  To be sure, "[a] vague or blanket (boilerplate) disclaimer
15   which merely warns the reader that the investment has risks will ordinarily be inadequate
16   to prevent misinformation." Inst. Investors Group v. Avaya, Inc., 564 F.3d 242, 256 (3d
17   Cir. 2009) (citation omitted).  "To suffice, the cautionary statements must be substantive
18   and tailored to the specific future projections, estimates or opinions in the prospectus
19   which the plaintiffs challenge." Id.  In other words, "the cautionary warning ought to be
20   precise and relate directly to the forward-looking statements at issue." Copper Mountain,
21   311 F. Supp. 2d at 882.  "[T]he PSLRA does not require a listing of all factors that might
22   make the results different from those forecasted.  Instead, the warning must only mention
23   important factors of similar significance to those actually realized." Id. (citations omitted).
24       Here, in its SEC filings, Astra warned of the possibility that its future TAM would
25   be insufficient to meet its near-daily launch cadence goals in 2025.  Astra stated that "the
26   market for in-space infrastructure services, in particular, commercial launch services for
27   small LEO satellites, has not been well established and is still emerging." Compl. ¶¶ 56,
28   89.  It further noted that "[Astra's] estimates for the total addressable launch market and

11

1 satellite market are based on a number of internal and third-party estimates" and that

2 "[w]hile we believe our assumptions and the data underlying our estimates are reasonable,

3 these assumptions and estimates may not be correct and the conditions supporting our

4 assumptions or estimates may change at any time, thereby reducing the predictive accuracy

5 of these underlying factors. As a result, our estimates of the annual total addressable

6 market for our services, as well as the expected growth rate for the total addressable

7 market for our services, may prove to be incorrect." See id. (emphases added).

8     These risk disclosures speak to Astra's ability to achieve a more frequent launch

9 capability by 2025, noting that its goals "will depend on our ability to add new launch

10 sites" and obtain regulatory approvals, among other things. Compl. ¶¶ 56, 89. These

11 cautionary warnings "relate directly," see Copper Mountain, 311 F. Supp. 2d at 882, to the

12 challenged statements that Astra hoped to do near-daily launches in 2025.

13     The Plaintiffs, however, argue that the cautionary language is inadequate because

14 the risks have already come to pass. Opp. at 14. Specifically, the Plaintiffs aver that

15 "Defendants' own assumptions about the 'intensely competitive' market, the existence of

16 rideshares, and multiple satellites launches in a single rocket, meant that 300 launches

17 would not happen in 2025." Id. For this proposition, the Plaintiffs cite Bodri v. GoPro,

18 Inc., 252 F. Supp. 3d 912, 932 (N.D. Cal. 2017). Opp. at 14.

19     It is true that "'[i]f a company were to warn of the potential deterioration of one line

20 of its business, when in fact it was established that that line of business had already

21 deteriorated . . . its cautionary language' may be inadequate." Bodri, 252 F. Supp. 3d at

22 932 (quoting In re Harman Int'l Indus., Inc. Sec. Litig., 791 F.3d 90, 102 (D.C. Cir. 2015)).

23 But the Bodri court went on to hold that the safe harbor did in fact shield the defendants

24 from liability there because "the cautionary language could apply to warn of further

25 deterioration from that point forward." Id. (emphasis added). Similarly, here, Astra noted

26 the intense competition in the space launch industry and the possibility of companies

27 delivering multiple satellites on a single launch—i.e., "rideshare"—as conditions that

28 could affect the number of launches in 2025. But this does not necessarily mean that the

12

1    market is already in a state that would make it impossible for Astra to do 300 launches in
2    2025 (or that market conditions would not change in Astra's favor).  That is because the
3    risk factors that Astra have identified equally apply to both the present and the future.
4        The Plaintiffs' claims also are based upon statements referencing Astra's plan to
5    increase the payload capacity of its rocket to 500kg by late 2023.  The Plaintiffs allege that
6    these statements were misleading because they "failed to reveal" that Astra would achieve
7    this goal by licensing engine IP from Firefly, and that the Firefly Agreement limited Astra
8    to two such engines per rocket.  See Compl. ¶¶ 69, 83, 92, 97, 101, 104.  According to the
9    Plaintiffs, this supposedly left Astra at a competitive disadvantage against competitors
10   developing larger capacity rockets.
11       In its SEC filings, nonetheless, Astra warned precisely that its competitors "may be
12   better positioned to exploit the market need for small [satellite] payloads."  See MTD, Ex.
13   6 at 25 (dkt. 67-6).  Astra noted: "We face intense competition in the commercial space
14   market and amongst our competitors . . . [W]e are aware of a significant number of entities
15   actively engaged in developing commercial launch capabilities for small and medium size
16   payloads . . . Many of our current and potential competitors are larger and have
17   substantially greater financial or other resources than we currently have or expect to have
18   in the future, and thus may be better positioned to exploit the market need for small
19   payloads and targeted orbital delivery, which is the focus of our business."  Id.  Astra also
20   stated that it was "witnessing a shift in the launch requirements of satellite operators, as the
21   launch industry adjusts from launching fewer than 100 satellites each year that were
22   primarily large GEOs [geostationary satellites], to launching over 1,000 small LEO
23   satellites each year . . . The launch industry's initial response was the introduction of
24   ridesharing, allowing multiple operators to share the cost of a large launch vehicle . . .
25   [Astra's] cost on a per kilogram basis has historically been greater than rideshare. . . ."  Id.
26   at 45.
27       Indeed, Astra warned the market that the space services industry is highly
28   competitive and that some of its competitors have greater resources.  Furthermore, contrary

13

1   to the Plaintiffs' assertion, Kemp never denied the existence of the Firefly Agreement.  He
2   remained silent about it.  And the Defendants consistently remained silent about how Astra
3   planned to achieve its 500kg capacity target by 2023.  The Complaint does not allege that
4   Astra made statements during the class period that the company aimed to exceed a payload
5   of 500kg, so the terms of the Firefly Agreement (and its existence) do not conflict with
6   Astra's representations.[2]  The Plaintiffs fail to adequately explain why the omissions were
7   misleading as opposed to merely incomplete.  See Brody v. Transitional Hospitals Corp.,
8   280 F.3d 997, 1006 (9th Cir. 2002) ("[P]laintiffs' complaint must specify the reason or
9   reasons why the statements made by [defendant] [are] misleading or untrue, not simply
10  why the statements [are] incomplete.").

11  Accordingly, the Court finds that the challenged statements were accompanied by
12  meaningful cautionary language and that the PSLRA safe harbor insulates the Defendants
13  from liability.[3]

### C. The Plaintiffs' Remaining Securities Claims Fail.

15  Section 14(a) of the Exchange Act protects only interest-holders with voting rights.
16  Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1106–08 (1991).  Here, Plaintiff
17  Garcia and Plaintiff Deng did not hold Holicity stock until July 9, 2021 and August 9,
18  2021, respectively—i.e., after the merger closed on June 30, 2021.  In other words, they
19  lacked the right to vote on the merger.  The Plaintiffs therefore do not have standing to
20  bring the proxy claim.  See, e.g., Kelley v. Rambus, Inc., 2008 WL 1766942, at *5 (N.D.
21  Cal. Apr. 17, 2008) (dismissing Section 14(a) claims where plaintiffs failed to show they
22  were shareholders on proxy record dates).

23  And because the Plaintiffs' primary Sections 10(b) and 14(a) claims fail, their

---

[2] Astra did not announce that it would focus on the next version of its launch, which aims to increase payload capacity to 600kg, until August 4, 2022—i.e., after the class period.  Compl. ¶ 115.
[3] Because the safe harbor issue is dispositive, the Court need not address whether the Defendants had actual knowledge that their statements were false (as alleged) and the other arguments raised in the parties' briefs.

14

secondary Section 20(a) claim is dismissed, too. See Kang v. Paypal Holdings, Inc., 2022 WL 3155241, at *13 (N.D. Cal. Aug. 8, 2022).

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is **GRANTED** with leave to amend. Should the Plaintiffs elect to file an amended complaint curing the deficiencies identified in this Order, the Plaintiffs shall do so within 21 days of this Order. Failure to meet the 21-day deadline to file an amended complaint or failure to cure the deficiencies identified in this Order will result in a dismissal with prejudice of the Plaintiffs' claims.

**IT IS SO ORDERED.**

Dated: August 2, 2023

CHARLES R. BREYER
United States District Judge

15